1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

VFD CONSULTING, INC.,

        Plaintiff,

  v.

21ST SERVICES, et al.,

        Defendants.
_____/

No. C 04-2161 SBA
*(Consolidated with Case No. C 04-2162 SBA)*

**ORDER**

[Docket No. 96]

      This matter comes before the Court on Defendants 21st Services, 21st Holdings, and Paul Kirkman's (collectively, "Defendants") Motion for Summary Judgment [Docket No. 96]. Having read and considered the arguments presented by the parties in the papers submitted to the Court, the Court finds this matter appropriate for resolution without a hearing. The Court hereby GRANTS Defendants' Motion for Summary Judgment [Docket No. 96].

## BACKGROUND

**A.    Factual Background**

      **1.    Parties**

      Plaintiff VFD Consulting, Inc. ("VFD") is a California corporation that conducts business in Mendocino County. Compl. at ¶ 2.[1] VFD is in the business of providing risk assessment research and product development to the life insurance and related industries. *Id.* at ¶ 7. Vera Dolan is the president

_____

    [1]All references to the Complaint herein are to the Complaint filed in Case No. C 04-2161 SBA.

United States District Court

For the Northern District of California

1   and sole owner of VFD.  Decl. of Vera Dolan ("Dolan Decl.") at ¶ 1.

2      Defendants 21st Services and 21st Holdings, LLC (collectively "21st Services") are businesses

3   operating out of Minnesota. *Id.* ¶¶ 2-3.  Paul Kirkman ("Kirkman") is the president of 21st Services.

4   *Id.* ¶ 18;  Decl. of Paul Kirkman ("Kirkman Decl.") at ¶ 1.  21st Services is in the life insurance

5   settlement (or "viatical") business.[2]  Compl. at ¶ 8.  One of the services that 21st Services provides is

6   life expectancy calculations through a product known as "MedDiag." *Id.* ¶ 7, 8.  21st Services' direct

7   competitors are EMSI, AVS, Fasano & Associates, and Amscot/Midwest.  Kirkman Decl. at ¶ 4.

8      **2.      Allegations**

9      In 1998, Kirkman joined with Bob Simon ("Simon") and Steve Walker ("Walker") to form 21st

10  Services.  Kirkman Decl. at ¶ 5.  Kirkman created the company in order to carry out his plan of

11  developing an objective system to create life expectancy evaluations.  *Id.*  The idea arose out of

12  Kirkman's recognition of the fact that an objective system for life expectancy evaluations would be

13  superior to the already existing method whereby a doctor or nurse would subjectively analyze a patient's

14  medical records. *Id.* at ¶¶ 3, 5.  The computerized system that 21st Services developed to achieve the

15  company's plan is known as "MedDiag."  *Id.* at ¶¶ 2, 3.

16     In total, 21st Services retained four consultants to help the company develop MedDiag:

17  Tillinghast Towers Perrin ("Tillinghast"), VFD, Minneapolis Consulting Group, and Hank George

18  ("George"). *Id.* at ¶ 6.  Tillinghast, an actuarial firm, was to provide 21st Services with mortality tables.

19  *Id.*  VFD was to provide 21st Services with underwriting expertise and to research publicly-available

20  reference materials for data allowing 21st Services to calculate debits from expected mortalities based

21  upon health conditions and other related matters. *Id.*  The Minneapolis Consulting Group was to create

22  the computer program used to run MedDiag. *Id.*  George, who was hired through VFD, was to provide

23  data relating to the impact of certain pharmaceuticals upon expected mortality. *Id.*

---

25     [2]Life insurance settlements allow senior citizens ("seniors") who no longer need their life
    insurance to sell their policies, thereby reducing the asset to cash to be used for current needs.
26  Kirkman Decl. at ¶ 4.  Buyers, called providers, pay future premiums and receive the benefits of the
    policy upon the insured's death. *Id.*  Providers are typically under restrictions from their investors,
27  which often require that the providers obtain at least two life expectancy evaluations from
    independent third parties. *Id.*  21st Services is such an independent third party that provides life
28  expectancy evaluations. *Id.*

United States District Court

For the Northern District of California

1     After 21st Services was formed, at some point in the spring of 1998, Kirkman contacted Dolan

2 by telephone and asked Dolan whether VFD would be willing to be involved as a consultant in the

3 creation of MedDiag.  Kirkman Decl. at ¶ 8.  Kirkman told Dolan that 21st Service was starting a

4 business that would offer administration services as well as life expectancy services.  Dolan Decl. at ¶

5 3.  Dolan recalls that Kirkman asked VFD to write a manual for evaluating the life expectancy of elders.

6 *Id.*; Decl. of Robert Bodzin ("Bodzin Decl.") at Ex. A (Dolan Depo. at 44:25-45:25, 49:1-13).  Dolan

7 understood that VFD was expected to use proprietary mortality tables and actuarial data provided by

8 Tillinghast.  Bodzin Decl. at Ex. A (Dolan Depo. at 48:10-15, 49:14-20).   At the time Kirkman

9 approached Dolan, he had already retained the Minneapolis Consulting Group to do the computer work

10 on the project.  Kirkman Decl. at ¶ 7.  However, with the exception of the mention of Tillinghast, during

11 this initial telephone call, Dolan does not recall Kirkman mentioning that any other companies would

12 be involved in the project.  Bodzin Decl. at Ex. A (Dolan Depo. at 49:25-50:10).  Also, Dolan does not

13 recall Kirkman mentioning that 21st Services would be doing work involving computers or that it

14 intended to create a computerized system.  Dolan Decl. at ¶ 3.  Instead, Dolan recalls that, in a

15 subsequent telephone conversation with Kirkman, Dolan suggested that 21st Services create a

16 computerized system.  *Id.* at ¶ 4.  Dolan also recalls that Kirkman liked the idea.  *Id.* at ¶ 4.

17     On June 5, 1998, Dolan sent Kirkman a facsimile stating:

18        Thank you so much for inquiring about my assistance with your extremely
         interesting project!  I look forward to working with you on it.
19        . . .
         As discussed, you will look over my credentials and references.  I will then fax
20        you my contract, which will include immediate deliverables and deadlines.
         After that point, I will commit to deliver within two weeks a list of appropriate
21        data resources not to exceed 40 hours at $100/hr.  We should also at that time
         set up a phone conference with Randy O'Connor to determine his needs and
22        preferences.  Afterwards, we should have a better idea of time, budget, and
         specific requirements in interpreting this data that would be sufficient for
23        Randy to do his actuarial magic.

24
25 Bodzin Decl. at Ex. B.

26     On or about June 9, 1998, Kirkman asked Dolan to sign a Confidentiality and Non-Disclosure

27 Agreement ("21st Services NDA") to protect 21st Services' business plan and intended computer

28 processes.  *Id.* at ¶ 8, Ex. 1.  The 21st Services NDA stated in pertinent part:

3

A. Company [defined as 21st Services] has invested substantial time, energy, and resources developing its business plan, including its processes, products, and marketing strategy; and

B.  Potential Client [VFD] wishes to receive confidential and proprietary information about [21st Services'] business and business plan . . .; and

C. [21st Services] wishes to protect the confidential and proprietary nature of its business, including but not limited to its business plan, processes, products . . . while allowing [VFD] the opportunity to evaluate the possibility of entering into a service agreement . . .

. . .

1. "PROTECTED INFORMATION" DEFINED. [VFD] acknowledges that all information communicated to them . . . that relates to [21st Services'] business, including but not limited to its business products, procedures, processes, concepts, ideas, methodology, pricing, . . . and trade secrets shall be deemed confidential, proprietary information . . .

Bodzin Decl. at Ex. 1.

Also on June 9, 1998, Dolan signed the 21st Services NDA and returned it to Kirkman with a cover letter stating the following:

Here is a signed version of your confidentiality agreement that should basically work, although I understand that VFD Consulting is not a 'potential client,' but a consultant.  Also here is my proposed contract that you may share with your legal counsel.  If you have suggestions, please let me know.

I look forward to working with you!

Kirkman Decl. at Ex. 3; Bodzin Decl. at Ex. A (Dolan Depo. at 51:16-53:10).  At the time that Dolan entered into the 21st Services NDA, Dolan does not recall asking 21st Services to insert any language into the agreement that would refer to VFD's confidential information, proprietary information, or trade secrets.  Bodzin Decl. at Ex. A (Dolan Depo. at 88:17-90:5).

As indicated in her June 9, 1998 letter, Dolan sent Kirkman a draft of a document entitled, "Agreement to Provide Consulting Services 21st Services/VFD Consulting, Inc." (referred to herein as the "1998 Agreement"), which was drafted by Dolan.  Kirkman Decl. at Ex. 3; Bodzin Decl. at Ex. A (Dolan Depo. at 91:9-94:14).

On June 10, 1998, Kirkman sent Dolan a fully executed copy of the 21st Services NDA.  *Id.* at ¶ 2. Kirkman also wrote to Dolan: "I will review your contract [the 1998 Agreement], share it with my two business partners and run it by our legal counsel for review.  I would expect that I would have

4

comments by next Wednesday." *Id.*

On or about June 22, 1998 or June 23, 1998, Dolan recalls that she and Kirkman spoke about the draft of the 1998 Agreement and what would happen when the contract expired at the end of three years.  Dolan Decl. at ¶ 7.  Dolan believes that she and Kirkman agreed that the "everything would continue as before." *Id.*

VFD and 21st Services entered into the 1998 Agreement on August 18, 1998.  Bodzin Decl. at Ex. A (Dolan Depo. at 50:11-51:11, Ex. 4).  The 1998 Agreement states in relevant part:

> **3. CONSULTING PURPOSE.**  Parties acknowledge that the purpose of this consulting engagement is to provide consulting services to [21st Services] as Itemized in Exhibit A 'Statement of Work to Be Performed' and any subsequent written amendments to Exhibit A. [21st Services] and [VFD] specifically agree that services performed under this Agreement are not intended to obtain or convey proprietary information from any source outside the scope of this Agreement.
>
> **4. NONDISCLOSURE.** [VFD] will not disclose, in any manner, the underwriting guidelines, processes and systems developed for [21st Services]. Proprietary and intellectual possessed by any of the parties shall not be affected in any way by this or any other agreement relating to this consulting engagement.

*Id.* at Ex. A (Dolan Depo. at Ex. 4).  The 1998 Agreement also provided that it had a three-year term "with a willingness to renegotiate at the end of the term" and was terminable upon fifteen days written notice.  *Id.*  The 1998 Agreement further provided that any modifications were to be "approved in writing by all parties." *Id.*  Additionally, the 1998 Agreement included a choice-of-law provision stating that "Minnesota law shall govern this Agreement." *Id.*

Subsequently, VFD conducted research of the relevant medical literature to find references that would be helpful in generating life expectancies for elders.  Lord Decl. at Ex. A (Dolan Depo. at 62:12-14).  Since there were no textbooks on the specific issue of how the life settlement industry worked, VFD borrowed concepts from the life underwriting and actuarial fields.  Dolan Decl. at ¶ 10.  VFD then organized the medical literature and references and provided the references to 21st Services.  *Id.*  The materials that VFD provided to 21st Service contributed to the creation of the risk factor aspect of the MedDiag system.  Dolan Decl. at ¶ 12.  Some of the references were used to quantify the risk factor "debits" and some of the references were used to provide qualitative information regarding the best

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

mode for the operation of the MedDiag system.  Dolan Decl. at ¶ 11.  Additionally, VFD provided 21st Services with writings containing the decision-making rules for life expectancy evaluations, risk assessment analyses, and tables.  Dolan Decl. at ¶ 13.

In the beginning of 1999, MedDiag went into production and 21st Services started selling its product to the public.  Dolan Decl. at ¶ 14.  Dolan was included in this process as an expert in the life expectancy calculation system.  *Id.*  Specifically, she was asked to participate in any and all questions or due diligence investigations and to provide information on 21st Services' behalf.  *Id.*

On April 30, 1999, at 21st Services' request, VFD entered into an agreement with George, who was also acting as a consultant to 21st Services on the MedDiag project.  Bodzin Decl. at Ex. A (Dolan Depo. at 132:1-135:17, 136:9-24).  The agreement between VFD and George stated in pertinent part:

> I understand that 21st Services has developed a life expectancy model for the senior population (age 60 and above).  This model was developed by 21st Services using data provided by Tillinghast Towers Perrin and VFD Consulting, Inc.

Bodzin Decl. at Ex. A (Dolan Depo. at 133:6-16; Ex. 15).   George also contributed to the life expectancy system aspect of MedDiag.  Dolan Decl. at ¶ 12.

On or about June 29, 2000, VFD prepared a manual entitled "Guide for Abstracting Information for Elder Life Expectancy Model" specifying how life settlements were to be performed.  Bodzin Decl. at Ex. A (Dolan Depo. at 60:11-25).   The manual clearly stated that it was the "Property of Paul Kirkman: 21st Services."  *Id.* at Ex. A (Dolan Depo. at 236:9-15).   Dolan acknowledges that she intended the document to belong to 21st Services.  *Id.* at Ex. A (Dolan Depo. at 236:9-15).

Also, at some point in 2000, 21st Services was audited by a firm called Milliman & Robertson ("Milliman") as part of a potential acquisition of 21st Services by another company.  Lord Decl. at Ex. B (Kirkman Depo. at 88:11-89:15).  Before disclosing any confidential information, 21st Services had Milliman sign a confidentiality agreement, so that any information learned during the audit would not be used for any reasons other than the audit.  *Id.*  During the audit, Deb Schmidt ("Schmidt") and Rick Bergstrom ("Bergstrom") of Milliman reviewed part of the MedDiag system.  *Id.*  They did not, however, have access to the "inner workings" of the MedDiag system or the software.  *Id.*  Instead, they mainly reviewed in-house medical records.  *Id.*

**United States District Court**

For the Northern District of California

On August 18, 2001, the written contract between VFD and 21st Services expired by its terms. Kirkman Decl. at ¶ 10.  However, 21st Services contends that it did not notice that the contract had expired until October 2003.  *Id.*  Dolan, on the other hand, recalls that she had a "casual" fifteen-to-twenty minute telephone conversation with Kirkman at some point between August 2001 and December 2001 and that, during the conversation, Kirkman stated "let's just — things are fine, let's just keep going." Bodzin Decl. at Ex. A (Dolan Depo. at 180:5-23, 209:11-12).  At no time did the parties discuss when their obligations to each other would terminate.  *Id.* at Ex. A (Dolan Depo. at 187:13-17). However, Dolan recalls that the parties agreed to a non-compete clause and altered the terms of payment. *Id.* at Ex. A (Dolan Depo. at 192:15-22).  Specifically, Dolan recalls that Kirkman stated that 21st Services would cap further payments to Dolan at $990 per week and that the remainder owed to VFD would be "carried forward" and paid on a later, unspecified date.  *Id.* at Ex. A (Dolan Depo. at 209:13-210:23).

Between August 18, 2001 through October 2003, VFD continued to perform work for 21st Services.  Dolan Decl. at ¶ 7.

In January 2003, 21st Service issued some promotional material that stated, in pertinent part, that "21st Diagnostics contracted with a Fellow of the Academy of Life Underwriting, Vera F. Dolan, FALU, to define our risk factors and their associated debits and credits."  Lord Decl. at Ex. I.  The publication also stated that "[a]ll of the underwriting research completed by Ms. Dolan for 21st Diagnostics ha[d] been reviewed by a medical doctor, whose field of practice is geriatrics and internal medicine." *Id.*  The publication further noted that Tillinghast had provided the "foundation" for the MedDiag system and that the Minneapolis Consulting Group had created the computer system model. *Id.*

In October 2003, Kirkman telephoned Dolan in order to negotiate a new contract.  Kirkman Decl. at ¶ 10.  The negotiations stalled in January 2004. *Id.*  On or around this time, VFD learned from Michael Gaines ("Gaines"), the Chief Financial Officer ("CFO") of 21st Services' competitor, EMSI, that one of EMSI's prospective clients, Coventry Financial (also known as "Coventry"), was displeased with the accuracy of 21st Service's MedDiag system. *Id.* ¶ 37.  Compl. at ¶ 38; Bodzin Decl. at Ex. A (Dolan Depo. at 347:9-348:2).  Dolan also believed, as a result of her January 2004 telephone

United States District Court

For the Northern District of California

conversation with Gaines, that Bergstrom had used the information he learned during Milliman's 2000 due diligence investigation to develop a competing life expectancy evaluation system for EMSI. Lord Decl. at Ex. A (Dolan Depo. at 354:15-24). Dolan immediately relayed her conversation with Gaines to Kirkman and asked whether Gaines' statements were true. *Id.* at Ex. A (Dolan Depo. at 352:17-353:3). Kirkman denied that 21st Services was having any problems with Coventry. *Id.* at Ex. A (Dolan Depo. at 353:4-12). Dolan believed, at the time, that Kirkman was lying to her. *Id.* at Ex. A (Dolan Depo. at 356:1-20). Five minutes after she ended her conversation with Kirkman, Dolan contacted Gaines and reported her conversation with Kirkman. *Id.* at Ex. A (Dolan Depo. at 358:4-23). Gaines reconfirmed his opinion that Coventry was upset with 21st Services' numbers. *Id.* Dolan told Gaines that 21st Services was lying to her. *Id.*

On February 6, 2004, while still in the process of negotiating a new contract with VFD, 21st Service issued VFD a "take-it-or-leave-it" offer, which expired on February 12, 2004 if not accepted. Kirkman Decl. at ¶ 10; Bodzin Decl. at Ex. A (Dolan Depo. at 193:14-194:13). VFD did not accept the offer. *Id.* Instead, VFD's attorney sent 21st Services a letter terminating any relationship between the two companies. *Id.* Additionally, on February 10, 2004, VFD notified 21st Services that the company was in breach of their oral contract and demanded that 21st Services cease and desist from using VFD's "intellectual property." Compl. at ¶ 26. 21st Services, however, disavowed the existence of an oral contract. *Id.* ¶ 27.

### 2.    Procedural History

On May 3, 2004, Plaintiff filed a Complaint for Preliminary and Permanent Injunction against Defendants in the Superior Court of Mendocino County (*VFD Consulting, Inc. v. 21st Services, et al.*, Case No. CVG-0492383). Also on May 3, 2004, Plaintiff filed a Complaint for Breach of Contract, Fraud, Negligence, Misappropriation and Conversion against Defendants in the Superior Court of Mendocino (*VFD Consulting, Inc. v. 21st Services, et al.*, Case No. CVG-0492385).

On June 1, 2004, Defendants filed a Notice of Removal relating to the removal of Case No. CVG-0492385 from Mendocino County Superior Court.[3] Also on June 1, 2005, Defendants filed a Notice

---

[3]The case was re-designated as Case No. C 04-2161.

of Removal relating to the removal of Case No. CVG-0492383 from Mendocino County Superior Court.[4]  Both cases were removed on the basis of diversity jurisdiction.

On August 23, 2004, Case No. 04-2161 and Case No. 04-2162 were deemed related by this Court.  On September 7, 2004, the two cases were consolidated into one action.

On May 23, 2005, Defendants filed an Amended Answer and Counterclaim.  In the Amended Answer and Counterclaim, Defendants assert a counterclaim against Dolan for libel and slander.

On October 21, 2005, Defendants filed the instant Motion for Summary Judgment or, in the alternative, Summary Adjudication.

## **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, a court may properly grant a motion for summary judgment if the pleadings and materials demonstrate that there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment may be granted in favor of a defendant on an ultimate issue of fact where the defendant carries its burden of "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case."   *Celotex*, 477 U.S. at 325; *see Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577 (Fed. Cir. 1989).

To withstand a motion for summary judgment, the non-movant must show that there are genuine factual issues which can only be resolved by the trier of fact. *Anderson*, 477 U.S. at 250.  The nonmoving party may not rely on the pleadings but must present specific facts creating a genuine issue of material fact. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The court's function, however, is not to make credibility determinations. *Anderson*, 477 U.S. at 249. The inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec. Serv.*, 809 F.2d at 631.

Additionally, the evidence presented by the parties must be admissible. Fed.R.Civ.P. 56(e).

---

[4]The case was re-designated as Case No. C 04-2162.

*United States District Court*
For the Northern District of California

**United States District Court**

For the Northern District of California

Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Falls Riverway Realty, Inc. v. City of Niagara Falls*, 754 F.2d 49 (2d Cir.1985); *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979).  Hearsay statements found in affidavits are also inadmissible. *See, e.g., Fong v. American Airlines, Inc.*, 626 F.2d 759, 762-63 (9th Cir.1980).

## ANALYSIS

**A.      Choice of Law**

As an initial matter, the Court must address the parties' dispute regarding which state law governs Plaintiff's trade secret and contract claims,[5] California or Minnesota.  With respect to the trade secret claim, Defendants contend that this Court must follow Minnesota law because Plaintiff's claims arise out of the 1998 Agreement, which includes a choice-of-law provision stating that "Minnesota law shall govern this Agreement."  As Defendants point out, California courts generally respect contractual choice-of-law clauses.  *See NedLloyd Lines v. Superior Court*, 3 Cal.4th 459, 464-65 (1992).  In making the determination of whether the choice-of-law provision should be enforced, California courts analyze whether the chosen state has a substantial relationship to the parties or whether there is another reasonable basis for the choice of law.  *Id.* at 466.  California courts also ask whether the chosen state's law is contrary to California's fundamental policies.  *Id.*  If valid, a choice-of-law provision encompasses all causes of action arising out of, or related to, the agreement.  *Id.* at 470.

Since 21st Services is in Minnesota and since MedDiag is operated in that state, Defendants argue that Minnesota has a substantial connection to the case.  Further, because Minnesota and California have both adopted the Uniform Trade Secrets Act, Defendants argue that Minnesota law is not contrary to California policy.  *See Surgidev Corp. v. Eye Technology*, 828 F.2d 452, 455 n.2 (8th Cir. 1987) (noting that both Minnesota and California have adopted the Uniform Trade Secrets Act).  Accordingly, Defendants state that trade secret claims should be analyzed under Minnesota law.

---

[5]As set forth in greater detail below, the remaining causes of action are undisputed. Therefore, the parties do not specifically address whether California or Minnesota law should be applied to Plaintiff's fraud, negligence, conversion, and constructive trust claims.  However, as these claims arise out of the same set of facts, the Court finds that Defendants' arguments apply with equal force to these claims.

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12

In response, Plaintiff argues that *NedLloyd* is readily distinguishable.  However, Plaintiff's attempt to distinguish *NedLloyd* is flawed.  As Defendants point out, in *NedLloyd*, the dispute on review involved a contractual choice-of-law provision contained in a shareholder's agreement stating that "[t]his agreement shall be governed by and construed in accordance with Hong Kong law[.]"  *Id.* at 468.  Although the defendant in *NedLloyd* argued that its claim for breach of fiduciary duty was independent of the contract, the court rejected this argument and found that all claims arising out of the contract or contractual relationship would be governed by the choice-of-law provision.  *Id.* at 469 ("When a rational businessperson enters into an agreement establishing a transaction or relationship and provides that disputes arising from the agreement shall be governed by the law of an identified jurisdiction, the logical conclusion is that he or she intended that law to apply to all disputes arising out of the transaction or relationship.")  As such, *NedLloyd* is not distinguishable and expressly supports Defendants' position that this Court should apply Minnesota law to the trade secret claim.

13
14
15
16
17
18
19
20
21
22
23
24

As to the breach of contract claim, Defendants assert that Minnesota law governs because – even accepting, *arguendo*, Plaintiff's argument that an oral contract was formed – there is no evidence that the parties agreed to anything other than a Minnesota choice-of-law provision.  In response, Plaintiff argues that this Court "should reject 21st attempt [*sic*] to have the Court apply Minnesota law in this case" due to the fact that Defendants have alleged that the 1998 Agreement expired by its own terms on August 18, 2001.  According to Plaintiff, since the 1998 Agreement is no longer in effect, the Court may choose to ignore the choice-of-law provision.  However, Plaintiff cites no authorities in support of its position.  Further, even assuming that the alleged oral contract is the operable contract governing the choice-of-law analysis, Plaintiff's argument is flatly contradicted by its assertion that the subsequent oral contract between the parties differed from the 1998 Agreement only with respect to the terms of payment and the addition of a non-compete clause.  Plaintiff has therefore produced no evidence that there is any agreement between the parties that provides for the applicability of California law.

25
26
27

Accordingly, the Court finds that Minnesota law governs this dispute.  However, as both parties concede, this finding is not outcome determinative, as there is no discernible difference between Minnesota law or California law with regard to the disputed causes of action.

28

**B.        Plaintiff's Trade Secret Claim**

United States District Court

For the Northern District of California

1   As the heart of the instant dispute focuses on Plaintiff's fourth cause of action for

2  misappropriation of trade secrets, the Court will analyze the trade secret claim first.  In Defendants'

3  Motion for Summary Judgment, Defendants argue that they are entitled to judgment as a matter of law

4  on Plaintiff's trade secret claim because Plaintiff has not shown either the existence of a trade secret *or*

5  the misappropriation of a trade secret by Defendants.  Both parties acknowledge that Plaintiff's ability

6  to establish the existence of a trade secret is critical to its case.  See *Electro-Craft Corp. v. Controlled*

7  *Motion, Inc.,* 332 N.W.2d 890, 897 (Minn. 1983) ("Without a proven trade secret there can be no action

8  for misappropriation, even if defendants' actions were wrongful.")

9   Defendants first argue that Plaintiff has not identified a cognizable trade secret.[6]  In response,

10  Plaintiff contends that it has identified two "trade secrets": (1) the MedDiag system; and (2) Dolan's

11  "experience and best judgment in the combination of the research data [for the MedDiag system]."

12  A "trade secret" is defined as information that:

13   (i) derives independent economic value, actual or potential, from not being
   generally known to, and not being readily ascertainable by proper means by,

14   other persons who can obtain economic value from its disclosure or use, and

15   (ii) is the subject of efforts that are reasonable under the circumstances to
   maintain its secrecy.[7]

16

17

---

18   [6]Defendants also argue that Plaintiff never identified its trade secret during any of the
   discovery proceedings, although it was required to do so.  *See Porous Media Corp. v. Midland*

19  *Brake, Inc.,* 187 F.R.D. 598, 600 (D. Minn. 1999) ("Ordering the listing of trade secrets at the outset
   of the litigation is a common requirement."); *see also* Cal. Code Civ. Proc. § 2019.210.  In fact,

20  according to Defendants, Plaintiff's interrogatory responses were utterly devoid of any facts
   sufficient to identify its trade secret.  *See* Bodzin Decl. at Ex. E at 6:22-7:4; Ex. F at 12:14-13:11.

21  Further, when asked to identify the alleged trade secret during her deposition, Dolan merely vaguely
   stated that the "development of the automated life expectancy calculation system" is "part" of the

22  trade secret Plaintiff is claiming.  *See* Lord Decl. at Ex. A (Dolan Depo. at 301:4-7).  Although
   Defendants are correct that Plaintiff did not sufficiently identify its trade secret during discovery,

23  Plaintiff is also technically correct that Defendants waived this objection by failing to raise it during
   discovery.  However, resolution of this particular dispute is unnecessary.  Regardless of whether

24  Plaintiff previously disclosed its trade secret, now that Defendants have moved for summary
   judgment, Plaintiff is *obligated* to identify its alleged trade secret with particularity.  If Plaintiff

25  cannot do so, Defendants are entitled to summary judgment.

26   [7]The Minnesota statute further provides that: "The existence of a trade secret is not negated
   merely because an employee or other person has acquired the trade secret without express or specific

27  notice that it is a trade secret if, under all the circumstances, the employee or other person knows or
   has reason to know that the owner intends or expects the secrecy of the type of information

28  comprising the trade secret to be maintained."  Minn. State § 325C.01.

United States District Court

For the Northern District of California

1    Minn. Stat. § 325C.01(5); *accord* Cal. Civ. Code § 3426.1(d).  The Minnesota Supreme Court has set

2    forth a four-point test that a court should employ when determining whether a trade secret exists.  *See*

3    *Cherne Industrial, Inc. v. Grounds & Associates, Inc.*, 278 N.W.2d 81 (Minn.1979).  Under this test,

4    the trade secret information must: (1) not be generally known or readily ascertainable; (2) provide a

5    competitive advantage; (3) have been developed at the *plaintiff's* expense; and (4) be the subject of

6    reasonable efforts by the *plaintiff* to keep it confidential.  *See id.*, 278 N.W.2d at 90; *Electro-Craft*, 332

7    N.W.2d at 898-99; *Jostens, Inc. v. National Computer Systems, Inc.*, 318 N.W.2d 691 (Minn.1982).

8         Turning first to Plaintiff's allegation that the MedDiag system is its trade secret, the Court finds

9    that there is absolutely *no* evidence supporting this claim.  To the contrary, the record is replete with

10   information showing that MedDiag is wholly, and undisputedly, 21st Services' property and was

11   developed at Defendants' expense.  In fact, Dolan admitted during her deposition that she had no role

12   in developing the MedDiag computerized model, never saw or operated the finished product, and may

13   have had – at most – one fleeting glance at a MedDiag life expectancy report.  *See* Lord Decl. at Ex. A

14   (Dolan Depo. at 145:5-146:19, 147:15-148:16).  Dolan also admitted that she never planned to create

15   an objective life expectancy calculation system before 21st Services hired VFD.  Bodzin Decl. at Ex A

16   (Dolan Depo. at 303:12-20).  Further, the undisputed evidence clearly shows that Plaintiff contributed

17   only to one facet of the MedDiag system, and that the other critical components, such as the actuarial

18   "foundation" and the computer model, were supplied by other entities at Defendants' expense.  *Id.*

19   Moreover, the contract that VFD entered into in April 1999 *specifically states* that the MedDiag system

20   belongs to 21st Services.  Accordingly, VFD cannot deny that it has acknowledged, in precise and

21   unambiguous language, that:

22        [VFD] understand[s] that *21st Services has developed* a life expectancy model
          for the senior population (age 60 and above).  This model was *developed by*
23        *21st Services* using data provided by Tillinghast Towers Perrin and VFD
          Consulting, Inc.
24
25   Bodzin Decl. at Ex. A (Dolan Depo. at 133:6-16, Ex. 15) (emphasis added).  Since it is undisputed that

26   Defendants own MedDiag and developed it at their own expense, the Court finds that Plaintiff has not

27   satisfied the four-point test set forth by the Minnesota Supreme Court in *Electro-Craft*.

28        Plaintiff's assertion that its *contributions* to the MedDiag system are "trade secrets" is also

without merit.  First, Dolan has admitted that the materials VFD provided to 21st Services were publicly available.  *See* Lord Decl. at Ex. A (Dolan Depo. at 307:1-17).  Moreover, although Plaintiff claims that the information is nevertheless a trade secret because it was selected using Dolan's "unique experience," Plaintiff has not identified, with any particularity, how Dolan organized or combined the materials in a manner that rises to the level of a legally protectable trade secret.  This is fatal to Plaintiff's claim.  *See Jostens*, 318 N.W.2d at 699 ("Simply to assert a trade secret resides in some combination of otherwise known data is not sufficient, as the combination itself must be delineated with some particularity in establishing its trade secret status"); *Strategic Directions Group, Inc. v. Bristol-Myers Squibb Co.*, 293 F.3d 1062, 1065 (8th Cir. 2002) ("Although [the defendant] paid [the plaintiff] for selecting a reduced number of questions from its battery of questions, 'the law of trade secrets will not protect talent or expertise, only secret information'").

Second, and more importantly, Plaintiff's trade secret claim necessarily fails because all of the admissible, undisputed evidence shows that Plaintiff made absolutely ***no*** effort to inform 21st Services – at any time – that VFD's contributions were to be considered confidential "trade secrets."  *See Strategic Directions Group, Inc.*, 293 F.3d at 1064-65 (holding that a plaintiff must prove that it made reasonable efforts to maintain secrecy); *Electro-Craft, Corp.,* 332 N.W.2d at 901 (holding that the plaintiff must show more than mere "intention;" the plaintiff must demonstrate that it manifested its intention by making some effort to keep the information secret).  Indeed, as Defendants point out, despite the multiple written contracts that were executed by both parties, Plaintiff has not identified a single document that references Plaintiff's trade secrets and/or creates an obligation on the part of 21st Services to keep VFD's intellectual property secret.  In contrast, there are three key documents in this case that clearly create an obligation on the part of *VFD* to keep *21st Services'* confidential and proprietary information secret: (1) the 21st Services' NDA; (2) the 1998 Agreement; and (3) the contract between VFD and George.  21st Services' NDA and the 1998 Agreement specifically reference VFD's obligation to keep all of 21st Services' trade secrets confidential.  Neither document contains any

United States District Court

For the Northern District of California

language with regard to information supplied by VFD.[8]

Additionally, the following testimony confirms that Dolan never requested that a reciprocal non-disclosure clause be included in VFD's contract with 21st Services:

> Q:   Ms. Dolan, I direct your attention to the nondisclosure section of the final contract, the first sentence.
>
> A:   Um-hmm
>
> Q:   Do you see that?
>
> A:   Yes.
>
> Q:   The first four words of that sentence say "Consultant will not disclose", correct?
>
> A:   That's correct.
>
> Q:   "Consultant" means VFD; is that correct?
>
> A:   That's correct.
>
> Q:   Did you propose that an additional sentence in paragraph four of the nondisclosure be put in that read identical to the first sentence except it stated with "client will not disclose"?
>
> A:   I did not propose that.

Bodzin Decl. at Ex. A (Dolan Depo. at 220:12-221:13).

Dolan also testified that she did not recall either requesting 21st Services to keep material provided by VFD secret or marking any of the material "confidential." *Id.* at Ex. A (Dolan Depo. at

---

[8]While Plaintiff attempts to rely on Paragraphs 3 and 4 of the 1998 Agreement to support its trade secret claim, there is no language in the 1998 Agreement that creates an obligation on behalf of 21st Services to keep any information provided by VFD confidential. Paragraph 3 of the 1998 Agreement merely states that the parties would not convey "any proprietary information from any source outside the scope of this Agreement." Ex. 4 ¶ 3. Thus, Paragraph 3 specifically provides that proprietary information would **not** be conveyed. Additionally, although Dolan now alleges, in her Declaration, that she *intended* for Paragraph 4 of the 1998 Agreement to create an obligation for 21st Services to keep information provided by VFD in confidence, Paragraph 4 only refers to VFD's obligation to refrain from "disclos[ing], in any manner, the underwriting guidelines, processes and systems developed for [21st Services]." To the extent that VFD now contends that this language is ambiguous, since VFD drafted the 1998 Agreement, the ambiguity is construed *against* VFD. *Kasdan, Simonds, McIntyre, Epstein & Martin v. World Sav. & Loan*, 317 F.3d 1064, 1070 (9th Cir. 2003); *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 66 (Minn.1979). Moreover, for Plaintiff to prove that it employed reasonable efforts to keep its proprietary material confidential, Plaintiff must show more than intent. It must show that it *manifested* its intent by actually *conveying* to 21st Services, in some way, that the information was supposed to be kept confidential. *Electro-Craft, Corp.*, 332 N.W.2d at 901.

215:13-217:9).  Additionally, Dolan admitted that she does not remember ever telling *anyone* at 21st Services that VFD's input into MedDiag was in any way secret, confidential, or proprietary.  *Id.* at Ex. A (Dolan Depo. at 303:21-24; 304:3-19).  Finally, although Dolan, in her deposition, indicated that a document entitled "Elder Model for Life Expectancies - 21st" was a "trade secret," Dolan later admitted that the "Elder Model for Life Expectancies - 21st" document was never shown or given to 21st Services.  Lord Decl. at Ex. A (Dolan Depo. at 146:20-147:3, Ex. 11).  Rather, according to Dolan, VFD only gave 21st Services the publicly available data that it researched.  Lord Decl. at Ex. A (Dolan Depo. at 146:25-147:3).

Additionally, and significantly, when VFD wrote a manual specifying how life settlements were to be performed, VFD wrote on the title page: "**Property of: Paul Kirkman 21st Services."**  Bodzin Reply Decl. at Ex. 3.  Dolan also included a copyright notice on every single page of the manual indicating that 21st Services owned the copyright to the manual.  *Id.*  Dolan admits that she wrote this statement and included the copyright notice in order to protect *21st Services'* rights in the manual.  *Id.* at Ex. 4 (Dolan Depo. at 232:8-236:14).

Tellingly, Plaintiff's Opposition brief fails to address any of this evidence.  Instead, Plaintiff argues that Plaintiff had an expectation of confidentiality solely because VFD and 21st Services were engaged in a collaborative process.[9]  Plaintiff does not cite *any* California or Minnesota case law in support of this proposition.[10]  Further, the cases upon which Plaintiffs relies, which are primarily non-binding district court cases or state court cases from other jurisdictions, are factually or legally inapposite.  For example, in *Abernathy-Thomas Engineering Co. v. Pall Corp.*, 103 F.Supp.2d 582, 603

---

[9]Plaintiff also devotes several pages of its Opposition brief to a confused and irrelevant discussion of whether certain statements made by Kirkman during his deposition "proves" that 21st Services "recognizes" Plaintiff's intellectual property rights.  Having reviewed the relevant deposition testimony, it is clear that the deposition testimony Plaintiff is relying on refers only to 21st Services' post-litigation efforts to redesign the MedDiag system in order to mitigate potential damages and/or potentially resolve the lawsuit.  In contrast, the appropriate inquiry here is whether *VFD* made any efforts – *during the relevant period* – to keep its alleged proprietary information confidential.  21st Services' remedial efforts are not relevant and this is precisely the type of evidence that must be excluded from consideration under Federal Rule of Evidence 407.

[10]Indeed, Plaintiff cannot do so, as Minnesota case law does not support Plaintiff's position.  *See Electro-Craft, Corp.,* 332 N.W.2d at 901 ("[E]ven under the common law, more than an 'intention' was required – the plaintiff was required to show that it had manifested that intention by making some effort to keep the information secret.")

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

(S.D.N.Y. 2000) the district court's holding was expressly premised on the fact that, under *New York* law, "a distributorship agreement may, in some rare instances, create a confidential relationship out of which [a] duty of fiduciary care arises." *Id.* Further, in *Kamin v. Kuhnau*, 374 P.2d 912, 919 (Oregon 1962), the Supreme Court of Oregon upheld a trade secret misappropriation claim after finding that a *contractor* who is "paid to assist plaintiff in the development of the [plaintiff's] idea" is not "entitled to appropriate those ideas to his own use." *Id.*; *accord A.L. Laboratories v. Philips Roxane, Inc.*, 803 F.3d 378, 380-383 (8th Cir. 1986) (applying Missouri law). Additionally, in *Harbor Software, Inc. v. Applied Systems, Inc.*, 887 F.Supp. 86 (S.D.N.Y. 1995), the trade secret misappropriation claim was based on the fact that the defendant had orally promised the plaintiff that the final written contract between the parties would contain a non-disclosure agreement. *Id.* at 88. Thus, each case cited by Plaintiff is vastly different from the case at bar. Accordingly, Defendants are correct that the authorities cited in Plaintiff's brief do not provide support for its argument.

Since Plaintiff has not established the *existence* of a legally protectable trade secret, the Court need not determine whether Plaintiff has proven misappropriation. However, the Court notes that the undisputed evidence also clearly shows that Defendants did not misappropriate any of Plaintiff's alleged trade secrets. Under Minnesota law, the misappropriation of a trade secret is either: (1) the improper acquisition of a trade secret; or (2) the disclosure or use of a trade secret without consent. *Sip-Top, Inc. v. Ekco Group, Inc.*, 86 F.3d 827, 833 (8th Cir. 1996). Here, it is undisputed that 21st Services specifically contracted with VFD to assist with the development of MedDiag and *paid* VFD to provide 21st Services with the relevant research materials. Indeed, the 1998 Agreement clearly states that VFD was to conduct "research and analysis" and "deliver" its work product to 21st Services. Further, Plaintiff knew that 21st Services would incorporate Plaintiff's work product into MedDiag. In fact, neither party disputes that the need to incorporate this information into MedDiag was the very reason Defendants hired Plaintiff in the first place. More importantly, VFD has admitted that the information supplied to 21st Services became 21st Services' property and that the parties never had any agreement that certain materials had to be returned to Plaintiff once the consulting relationship terminated. As such, Plaintiff has not shown that any proprietary materials were obtained improperly by Defendants or that Defendants have continued to use certain materials without Plaintiff's consent.

1    Thus, for all of the above reasons, the Court finds that Defendants are entitled to summary

2    judgment on Plaintiff's trade secret claim.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

### C.      Plaintiff's Breach of Contract Claim

The Court also finds that Defendants are entitled to summary judgment in their favor on Plaintiff's first cause of action for breach of contract.  Plaintiff's breach of contract claim is premised on the oral contract that the parties purportedly entered into after the 1998 Agreement expired on its terms on August 18, 2001.  Plaintiff alleges that Defendants breached this oral contract when they stopped paying Plaintiff $33 per case evaluation on January 8, 2004.  Plaintiff's sole evidence of this oral contract, however, is Dolan's recollection that, at some point between August 2001 and December 2001, Dolan had a "casual" fifteen-to-twenty minute telephone conversation with Kirkman and that, during the conversation, Kirkman stated "let's just — things are fine, let's just keep going."  Bodzin Decl. at Ex. A (Dolan Depo. at 180:5-23, 209:11-12).  In response, Defendants argue that there was no contract, written or oral, after the 1998 Agreement expired in August 2001.  Defendants further argue that the statement "let's just keep it going" was not sufficient, as a matter of law, to create a new contract between VFD and 21st Services.

Defendants are correct that a contract, oral or otherwise, does not exists unless the parties "agree with reasonable certainty about the same thing and on the same terms."  *Peters v. Mut. Ben. Life Ins. Co.*, 420 N.W.2d 908, 914 (Minn. Ct. App. 1988).  Here, there is no evidence that the parties reached agreement on the fundamental terms of the contract.  *Jensen v. Taco Johns Int'l*, 110 F.3d 525, 527 (8th Cir. 1997) (applying Minnesota law).  For example, critically, Plaintiff admits that the parties never discussed when their obligations to each other would terminate.  Bodzin Decl. at Ex. A (Dolan Depo. at 187:13-17).  Dolan only recalls that the parties agreed to a non-compete clause and altered the terms of payment.  *Id.* at Ex. A (Dolan Depo. at 192:15-22).  However, with respect to the terms of payment, which is arguably the most fundamental component of the agreement, and the term that Plaintiff contends was "breached," Dolan admits that the terms were left undefined.  *Id.* at Ex. A (Dolan Depo. at 209:13-210:23) (stating that Dolan recalls only that 21st Services would cap payments to Dolan at $990 per week but that the remainder owed to VFD would be "carried forward" and paid on a later, unspecified date.  Further, Dolan admits that there was no discussion with regard to the parameters of the alleged non-compete provision, such as the geographic scope or applicable time limitation.  In fact, Dolan has admitted that those terms were also left undefined.  Lord. Decl. at Ex. A (Dolan Depo. at

United States District Court

For the Northern District of California

195:16-206:8).[11]

Again, Plaintiff's Opposition does not adequately address any of Defendants' arguments. The Opposition merely states that the parties "agreed" at some point in 2001 that "VFD would continue to perform the same work as described in the original written contract executed on August 18, 1998" – with the additional requirements that the terms of payment would be modified and that VFD would not be permitted to work for any of 21st Services' competitors – and that this vague agreement is sufficient to establish a breach of contract claim. Plaintiff does not cite *any* case law in support of this contention. Plaintiff's Opposition is therefore utterly insufficient. Further, even considering the facts in the light most favorable to Plaintiff, Plaintiff has not made a significant showing that the terms of payment in the alleged contract were reasonably certain. As such, Plaintiff has not established – and cannot establish – that the terms of payment were "breached" by Defendants. The Court therefore GRANTS Defendants' Motion with respect to Plaintiff's breach of contract claim.

**D.    Plaintiff's Negligence Claim**

Defendants also argue that Plaintiff's negligence claim fails because VFD has not produced any admissible evidence showing that 21st Services enabled the alleged theft of MedDiag.[12] Summary judgment in a negligence action is appropriate if the record does not support any one of the following elements required to establish the negligence claim: (1) duty; (2) breach of duty; (3) proximate cause; or (4) injury. *Hudson v. Snyder Body, Inc.*, 326 N.W.2d 149, 157 (Minn. 1982). Whether a duty exists is a question of law. *H.B. by Clark v. Whittemore*, 552 N.W.2d 705, 707 (Minn. 1996).

Again, Plaintiff utterly fails to respond to Defendants' arguments and Plaintiff's Opposition brief is, in fact, completely silent with regard to Plaintiff's negligence claim. Under this Court's standing orders, the failure of the opposing party to oppose any motion shall constitute a consent to the granting

---

[11]Additionally, Dolan has admitted that the discussion regarding the alleged "non-compete" did not even occur during the same discussion wherein the oral contract was allegedly formed. *Id.* at Ex. A (Dolan Depo. at 195:16-24).

[12]Dolan's negligence claim is premised on her belief that Bergstrom improperly used information gleaned from Milliman's 2000 due diligence investigation to develop a competing life expectancy evaluation system for EMSI. Lord Decl. at Ex. A (Dolan Depo. at 354:15-24). Plaintiff does not dispute that Dolan's "belief" is based solely on second-hand hearsay information purportedly conveyed to her during a January 2004 telephone conversation with Gaines.

United States District Court

For the Northern District of California

1  of the motion.  Standing Ord. § C, ¶ 5 (Feb. 9, 2005).  Thus, given that Plaintiff has failed to offer any

2  opposition to this aspect of Defendants' Motion, the Court finds that Plaintiff has consented to the

3  dismissal of its negligence claim.  Further, upon review of the papers submitted by the parties, it is clear

4  to the Court that there is no genuine issue of material fact with respect to Plaintiff's negligence claim.

5  Indeed, there is no dispute that Plaintiff's sole "evidence" of the alleged theft is premised on mere

6  speculation and double hearsay.  There is also no evidence that Defendants breached any of the duties

7  owed to Plaintiff.  As such, the Court finds that Defendants are entitled to judgment as a matter of law

8  on Plaintiff's negligence claim.

9  **E.      Plaintiff's Fraud Claim**

10      Defendants are also entitled to judgment in their favor on Plaintiff's fraud claim.  In Minnesota,

11  to state a claim for fraud, the plaintiff must show:

12          (1) false representation of a material fact; (2) knowledge of its falsity (or an
           assertion of the fact without knowledge of its truth or falsity) on the part of the
13          person representing; (3) an intention on the part of the person representing that
           it induce the other party into action (or circumstances justifying reasonable
14          action); and (4) a detrimental act based on the representation.

15  *Popp Telecom, Inc. v. Am. Sharecom, Inc.*, 361 F.3d 482, 491 (8th Cir. 2004).

16      The Court finds that all of Plaintiff's fraud allegations are without merit.  Plaintiff first asserts

17  that Defendants misrepresented the fact that 21st Services was not having any problems with Coventry

18  as of January 2004.  However, this allegation does not state a claim because Defendants have shown that

19  Kirkman's statement was a non-actionable opinion.  *See Am. Computer Trust Leas. Jack Farrell Impl.*

20  *Co.*, 763 F. Supp. 1473, 1487 (D. Minn. 1991).  Further, Plaintiff cannot establish the elements of

21  reasonable reliance or damages because Dolan clearly stated in her deposition that she believed Kirkman

22  was lying to her at the time the statement was made.

23      Additionally, as to Plaintiff's assertion that Defendants defrauded VFD when Kirkman told

24  Dolan that MedDiag needed "only a few minor adjustments,"  Defendants point out that Dolan did not

25  enter into a new contract with Defendants after learning this information.  As such, again, Plaintiff

26  cannot establish damages or reliance.  Finally, as to Plaintiff's assertion that VFD was deceived into

27  believing that it would have the right to audit the number of case evaluations performed by Defendants,

28  it is clear that no such right is set forth in the relevant written contract.  Further, where fraud is alleged

United States District Court

For the Northern District of California

regarding a future event, Minnesota law requires, as an additional element of proof of fraud, that Plaintiff show that Defendants had no intention of performing when the promise was first made. *Martens v. Minnesota Min. & Mfg. Co.*, 616 N.W.2d 732, 747 (Minn. 2000). Plaintiff has produced no such evidence here. Moreover, yet again, VFD's Opposition brief utterly fails to address any of Defendants' arguments regarding the fraud claim. Accordingly, due to Plaintiff's lack of opposition, and based on the undisputed evidence that is before the Court, the Court finds that Defendants are entitled to judgment in their favor on Plaintiff's fraud claim.

**F.      Plaintiff's Conversion and Constructive Trust Claims**

Finally, Defendants argue that Plaintiff's conversion and constructive trust claims must be dismissed because they fail to state a claim. Conversion is an act of willful interference with the personal property of another which is without justification or which is inconsistent with the rights of the person entitled to the use, possession, or ownership of that property. *Dain Boswroth Inc. v. Goetze*, 374 N.W.2d 467, 471 (Minn. App. Ct. 1985). To establish conversion under Minnesota law, the plaintiff must show both: (1) that he has a property interest, and (2) that the defendant deprived plaintiff of his property interest. *In re Air Transp. Excise Tax Litig.*, 37 F. Supp. 2d 1133, 1143 (D. Minn. 1999). The plaintiff must also prove damages and bears the burden of establishing all of the elements of his claim. *Larson v. Archer-Daniels-Midland Co.*, 32 N.W.2d 649, 650 (Minn. 1948).

Here, Plaintiff relies on two separate counts of conversion: (1) that Defendants "converted" the life expectancy calculations process; and (2) that Defendants "converted" the $33 per evaluation purportedly owed to Plaintiff pursuant to the alleged oral contract. As Defendants argue, however, the first conversion claim is not cognizable under Minnesota law because it pertains to the conversion of an alleged trade secret. *Bloom v. Hennepin County*, 783 F. Supp. 418, 439-41 (D. Minn. 1992) (declining to extend the tort of conversion to intangible property such as a trade secret). Further, as stated, *supra*, since there is no evidence that VFD owned any "trade secrets," there is no evidence that any trade secrets were "converted" by Defendants.

As to the second conversion claim, the law is also clear that a mere contractual right of payment, without more, does not suffice to sustain a claim for conversion. *Halla v. Norwest Bank Minnesota, N.A.*, 601 N.W.2d 449, 453 (Minn. App. 1999); *Farmers Ins. Exch. v. Zerin*, 53 Cal. App. 4th 445, 452

United States District Court

For the Northern District of California

1   (Cal. Ct. App. 1997).  Thus, Defendants are correct that Plaintiff's cause of action for conversion fails

2   to state a claim.

3          Defendants are also correct that Plaintiff's constructive trust claim is similarly defective because

4   Plaintiff has not shown that Defendants wrongfully possessed any property belonging to Plaintiff.

5   Further, Plaintiff's separate "constructive trust" claim is not cognizable under either Minnesota or

6   California law.  *Thompson v. Nesheim*, 159 N.W.2d 910, 917 (Minn. 1968); *Stansfield v. Starkey*, 220

7   Cal. App. 3d 59, 76 (1990).

8          Since Plaintiff's Opposition brief yet again fails to respond to any of Defendants' arguments,

9   Defendants' Motion for Summary Judgment is hereby GRANTED with respect to both the conversion

10  and the constructive trust claims.

11                                         **CONCLUSION**

12         IT IS HEREBY ORDERED THAT Defendants' Motion for Summary Judgment [Docket No.

13  96] is GRANTED.[13]

14         IT IS SO ORDERED.

15

16  Dated: 3/15/06                                    SAUNDRA BROWN ARMSTRONG
                                                       United States District Judge
17

18

19

20

21

22

23

24

25  _____

26         [13]The Court notes that the parties are currently scheduled to attend a settlement conference
    before Magistrate Judge Zimmerman on March 16, 2006.  In the event that the parties are unable to
27  resolve the remaining defamation claim during the settlement conference, the Court urges the parties
    to meet and confer regarding whether they are willing to consent to the jurisdiction of a Magistrate
28  Judge for the trial of the remaining claim.  The parties should inform the Court in writing of their
    decision no later than <u>March 31, 2006</u>.